633 F.2d 302
 105 L.R.R.M. (BNA) 2198, 89 Lab.Cas. P 12,246
 PITTSBURGH-DES MOINES STEEL COMPANY
v.
UNITED STEELWORKERS OF AMERICA, AFL-CIO; United Steelworkers
of America, Local Union No. 2789; William M. Welsh, Gale
O'Malley; Joseph E. Grzeczka, United Steelworkers of America
AFL-CIO, William M. Welsh, Gale O'Malley, and Joseph R.
Grzeczka, Appellants.
PITTSBURGH-DES MOINES STEEL COMPANY
v.
UNITED STEELWORKERS OF AMERICA, AFL-CIO; United Steelworkers
of America, Local Union No. 2789; William M. Welsh, Gale
O'Malley; Joseph E. Grzeczka, United Steelworkers of
America, Local Union No. 2789, Appellant.
 Nos. 79-2435, 79-2436.
 United States Court of Appeals,
Third Circuit.
 Argued May 23, 1980.
Decided Aug. 6, 1980.
 
 Richard J. Brean (argued), Rudolph L. Milasich, Jr. (argued), Pittsburgh, Pa., Bernard Kleiman, Chicago, Ill., of counsel, for appellants.
 Richard I. Thomas (argued), Martin J. Saunders, Thorp, Reed & Armstrong, Pittsburgh, Pa., for appellee.
 Before SEITZ, Chief Judge, and GIBBONS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 United Steelworkers of America, AFL-CIO (the International), United Steelworkers of America, Local Union No. 2789 (the Local), and William M. Welsh, Gale O'Malley and Joseph R. Grzeczka, union officers, all appeal from an order entered in a suit under section 301 of the Labor Management Relations Act of 1947, 29 U.S.C. § 185, granting a preliminary injunction against a strike in violation of a no strike clause in a collective bargaining agreement with the Pittsburgh-Des Moines Steel Co. (the Employer). The Local also appeals from an order holding it in contempt and imposing on it a $2500 fine. We hold that no injunction should have been directed against the International, that the injunction directed against the Local was broader than the law permits, and that the order holding the Local in contempt was improper.
 
 
 2
 I. Facts and Proceedings in the District Court
 
 
 3
 The Employer and the International and Local have long been parties to a collective bargaining agreement. The most recent contract was negotiated in November 1978 and extends through April 1982. The contract contains a broad grievance and arbitration clause which includes an express agreement that there will be no work interruptions while grievances proceed through the multi-stage contractual dispute resolution process.[1] In the ten years preceding the events in August 1979 which led to this lawsuit, there were no unauthorized work stoppages at the Employer's plant.
 
 
 4
 The Employer contends that the contract gives it sole control over work assignments as a management prerogative. On August 14, 1979 a dispute arose over the assignment of fiberglass insulation work to senior first class fitters. That work had previously been assigned to general helpers, the least skilled workers in the plant. The work was generally detested because handling fiberglass insulation is considered distasteful, if not hazardous. The fitters wanted to walk out immediately, but were dissuaded from doing so by the officers of the Local. Representatives of the Employer and the Local met that afternoon in an effort to resolve the dispute. Although the attempt at resolution was unsuccessful, the next day the fiberglass insulation work was temporarily reassigned to more junior employees. On August 16, however, the Company reasserted its claim that it had the right to assign the work to first class fitters. When the assignments were made several fitters went home claiming to be ill. When a second group of fitters was ordered to do the work, one of them went home and another tried unsuccessfully to grieve the assignment. Once again, the members of the Local were prepared to walk off the job, but were dissuaded from doing so by the Local's officers, who agreed to try again to resolve the matter. Representatives of the Local and the Employer met that afternoon. The Employer insisted that work assignment was, under the contract, a management prerogative, and announced that the fitters who had gone home rather than perform fiberglass insulation work would be discharged. At this point the entire membership of the Local, thoroughly aroused over the dispute, decided to strike. Gale O'Malley, President of the Local, called a special membership meeting for Friday, August 17th at 7:00 a. m., the time at which the plant's first shift normally reported for work. At this meeting, the members decided to continue the work stoppage at least until August 20th, when they agreed to meet again. A motion to that effect was passed unanimously by the Local membership present at the meeting.
 
 
 5
 Meanwhile, on the evening of August 16, the Employer's plant manager, having heard rumors that there might be a strike in violation of the contract, telephoned William M. Welsh, the International's representative, at his home and advised him of the rumors. When the strike materialized on the morning of August 17, the plant manager again telephoned Welsh and informed him of it. That afternoon Welsh met with O'Malley, the President of the Local, in an unsuccessful attempt to resolve the dispute. He also met that day with representatives of the Employer and advised them that the Local membership had made it clear that they would not arbitrate the work assignment and discharge issues. Welsh did not endorse their position, however, and at a meeting later that day he urged the Local's officers to get their men back to work. They informed him that the mood of the members made that impossible. Welsh appeared at the Local's membership meeting on August 20 and repeatedly urged the members to go back to work, informing them that their actions were illegal. He was hooted down and the work stoppage continued.
 
 
 6
 On the morning of August 20, the Employer filed its section 301 complaint against the International, the Local, International Representative Welsh, Local President O'Malley, and Local Vice President Grzeczka. The Employer obtained, ex parte, a temporary restraining order restraining the defendants and all persons acting in concert with them, including all members of the Local, from engaging in any strike, slowdown, or refusal to work. A hearing on the Employer's request for a preliminary injunction was scheduled for August 23, 1979. The temporary restraining order was served on the defendants and certain other Local members on the afternoon of August 20.
 
 
 7
 On the morning of August 21, at another meeting of the Local membership the temporary restraining order was read to the members, as was a telegram from the President of the International which advised the members that the strike was illegal and directed them to return to work. The members, however, still refused to return to work. When the temporary restraining order did not produce an end to the strike, the Employer moved for an order adjudicating the defendants in contempt. An order to show cause was issued directing the defendants and three other Local members to show cause on the afternoon of August 22, why they should not be held in contempt for failing to obey the temporary restraining order. The order to show cause also rescheduled the hearing on the motion for a preliminary injunction from August 23 to the afternoon of August 22.
 
 
 8
 Welsh continued to urge the officers of the Local to return to work, and at his urging they punched in for work on the morning of August 22, but punched out again shortly thereafter in order to prepare for the district court hearing scheduled for that afternoon.
 
 
 9
 After a hearing during which testimony was taken establishing the foregoing facts, the district court entered the preliminary injunction and the contempt order appealed from herein. The preliminary injunction ordered:1. That defendants, and each of them, and the officers, representatives, agents and members of Defendant Unions and all persons acting under, by, through, or in concert with them, or any of them, are enjoined from engaging in any strike, slowdown or any other interference with or impeding of work or operations at Plaintiff Pittsburgh-Des Moines Steel Company's Neville Island facilities.
 
 
 10
 2. That Plaintiff and Defendant Unions are directed and required to utilize the grievance-arbitration procedure set forth in their collective bargaining agreement for the resolution of any and all disputes over the job assignments of first-class fitters and the discharges of first-class fitters.
 
 
 11
 5. That Defendant Unions and their officers are ordered reasonably to employ all means at their disposal to insure that this injunction is obeyed, including but not limited to those provided for in their constitution and by-laws including instituting disciplinary proceedings against any member who violates the collective bargaining agreement or this injunction.
 
 
 12
 The contempt order provides that the Local is
 
 
 13
 adjudged to have been in contempt of this court's temporary restraining order entered August 20, 1979, and is directed to pay a fine of $2500.00, the plaintiff to collect said amount from the dues normally deducted from the payroll and transmitted to the Union, and thereafter to forward the same to the court for the benefit of the United States.
 
 
 14
 These appeals followed.
 
 II. The Appeal of the International
 
 15
 The International, a party to the collective bargaining agreement, does not object to being named as a party in a section 301 suit seeking an order directing that the parties pursue a contractual arbitration remedy. It enthusiastically supports the Employer's insistence that the work assignment and discharge grievances should be arbitrated. It objects strenuously, however, to the issuance of any injunctive relief directed to it with respect to what it concedes to be an illegal strike. The record establishes, the International urges, that it did not instigate, support, ratify, or encourage this "wildcat" strike by the Local, but, rather that it actively opposed the strike and urged the Local members to return to work and arbitrate their grievances. Thus, the International urges, there was no basis in the record for ordering any affirmative injunctive relief against it with respect to the strike. The Employer contends that Mr. Welsh supported, ratified, and encouraged the strike. The only indication of support, ratification, and encouragement to which the Employer points is the evidence that at the meeting on the afternoon of August 17, Welsh advised the Employer that the members of the Local had made it clear that they would not arbitrate the work assignment and discharge issues. This is not evidence of Welsh's support, ratification, or encouragement and there is ample evidence that at all times Welsh, on behalf of the International, opposed the strike. The district court made no finding of support, ratification, or encouragement. The Employer argues that despite the absence of a finding, the evidence in the record establishes ratification. We find no such evidence.
 
 
 16
 It is clear, therefore, that the district court did not direct injunctive relief against the International because of any instigation, support, ratification, or encouragement on its part. Rather, the court believed that as a matter of law the International, despite its opposition to the strike, could be ordered to take steps to end it. The International contends that this was legal error.
 
 
 17
 This is not a case in which the plaintiff seeks to impose upon the International liability for money damages for the acts of members of the Local in violation of the contract. Thus it does not present the issues discussed by this court in Republic Steel Corp. v. UMW, 570 F.2d 467 (3d Cir. 1978), and by the Supreme Court in Carbon Fuel Co. v. UMW, 444 U.S. 212, 100 S.Ct. 410, 62 L.Ed.2d 394 (1979). In Republic Steel we suggested that an International Union could be liable for damages resulting from the illegal activities of its members on the theory that there was an obligation, implied from the contract terms or as a matter of law, to take reasonable affirmative efforts to halt the illegal activities. Republic Steel Corp. v. UMW, 570 F.2d at 470; see Eazor Express, Inc. v. International Bhd. of Teamsters, 520 F.2d 951, 959-60 (3d Cir. 1975) (International's liability for damages), cert. denied, 424 U.S. 935, 96 S.Ct. 1149, 47 L.Ed.2d 342 (1976). In Carbon Fuel the Supreme Court overruled Republic Steel, holding that neither the National Bituminous Coal contract nor the Labor Management Relations Act provided authority for imposing on an International liability in damages for the illegal actions of its members which it did not instigate, support, ratify, or encourage. Carbon Fuel Co. v. UMW, 444 U.S. at 214 & n.4, 218, 100 S.Ct. at 412 & n.4, 414.
 
 
 18
 There was no occasion in Republic Steel or Carbon Fuel, however, for either court to consider the narrower question presented here. That question is whether, when an International is a party to a collective bargaining agreement containing a no strike clause which a Local Union has breached by striking, but which the International has not breached, the district court nevertheless may direct the International to take affirmative steps to end the strike. The clear negative inference from Carbon Fuel is that if an International Union instigates, supports, ratifies, or encourages such an illegal strike it can be held liable for damages. Injunctive relief is an a fortiori case. But where, as here, the International Union not only does not ratify the strike, but actively opposes it, a damage remedy against the International is foreclosed. In this situation, however, Carbon Fuel does not answer definitively the injunctive relief question.
 
 
 19
 We start with the premise that the underlying disputes are arbitrable, and thus that a Boys Markets injunction is permissible, despite the Norris-LaGuardia Act. Boys Markets, Inc. v. Retail Clerks Union, 398 U.S. 235, 249-53, 90 S.Ct. 1583, 1591-1593, 26 L.Ed.2d 199 (1970). A Boys Markets injunction, like a section 301 damage remedy, is a remedy for breach of contract; it is a form of specific performance. Symmetry might suggest that if the International has not committed a breach of contract, and thus cannot be held liable in damages, it also may not be sued for specific performance. But the law of prospective contract remedies is not so sterile as to require that result. When a court has a case before it justifying an injunction to prevent a breach of contract by a party to that contract, there must be authority to issue injunctive relief even against third parties where such relief is necessary, or perhaps merely helpful, in effectuating the relief against the contracting party in default. Commercial Security Bank v. Walker Bank & Trust Co., 456 F.2d 1352, 1354-55 (10th Cir. 1972); see, e. g., United States v. New York Telephone Co., 434 U.S. 159, 174, 98 S.Ct. 364, 373, 54 L.Ed.2d 376 (1977) (power conferred by § 1651 extends to non-parties "in a position to frustrate the implementation of a court order"); Bullock v. United States, 265 F.2d 683, 690-91 (6th Cir. 1959) (court has power under § 1651 to enjoin non-parties to prevent interference with valid court order); 28 U.S.C. § 1651 (1976) (court may issue "all writs necessary or appropriate in aid of their . . . jurisdiction"). Thus, for example, the district court, as an initial proposition, has the authority to enjoin the International in order to bring into play internal disciplinary mechanisms if such procedures will be helpful in bringing about an end to the defaulting behavior. The basis for such relief against a third party is not culpability, but practical necessity. Nothing in Carbon Fuel suggests that the Court intended to prevent district courts from making such specific orders against non-culpable third parties as may be necessary or helpful in making a Boys Markets injunction effective. But while we assume that the International's lack of culpability is not a bar to injunctive relief against it in all cases, we cannot in this case affirm the grant of such relief, for on the present record there is no evidence, and the trial court made no findings, suggesting that an order directing the International to take steps to end the strike was either necessary or helpful.
 
 
 20
 We note, first, that prior to August 1979 the Employer and the Local had enjoyed ten years of peaceful resolution of grievances under the contract mechanisms. There is no suggestion that the Local had a history of defiance of the terms of contracts negotiated on its behalf by the International, and thus no apparent need for the district court to insist upon the assistance of the International's imposition of internal union disciplinary procedures. There is, moreover, no evidence from which one might conclude that a preliminary injunction directed only against the Local and its officers and members would be disobeyed. It is true that a temporary restraining order was not instantly effective, but even that defiance ended in two days. The International at all times counseled and demanded obedience to that order. There is no evidence suggesting that different or firmer steps by the International would have been any more effective.
 
 
 21
 The International points out, moreover, that routinely subjecting it to an injunction in Boys Markets cases may actually be counterproductive. It points out that no defendant, not even a non-culpable third party defendant, is likely to subject itself willingly to an injunction and the potential risk of civil and criminal contempt for its future action or inaction. Thus in most instances any attempt to obtain an injunction against an International Union will be resisted, even when the International Union strongly opposes the local's strike action. This, in the eyes of the striking members may tend to align the International Union with them, and thereby weaken its ability to persuade them to discontinue their strike.
 
 
 22
 Moreover, the only form of injunctive order directed to a parent union that is likely to add to the sanctioning authority of the district court order is one requiring resort to internal union disciplinary proceedings, either against the local or against individual striking members. Inevitably such an order will be an intrusion of the court into the internal affairs of the union, which will result in the substitution of the court's judgment as to when such disciplinary proceedings are appropriate for that of the International Union's elected officials. Such an intrusion should not be precluded, but certainly should only be permitted to happen infrequently rather than routinely.
 
 
 23
 We deal here with a non-culpable parent union, one which has neither instigated, supported, ratified, or encouraged a strike by its member local which is in breach of a collective bargaining agreement. There may be circumstances in which the district court should direct such a parent union to take affirmative steps in aid of a valid Boys Markets injunction. But we do not think any such order should be entered absent findings by the district court: (1) that its own order directed to the local union and its members will not be fully effective; (2) that the steps already taken by the International are not likely to be effective; and (3) that specific additional steps, carefully specified in the order, will add significantly to the deterrent effect of the injunction against the local and its members. Even when the court has made these findings it should still consider whether, in view of the inevitable intrusion upon the internal affairs of the union, the marginal potential increase in the effectiveness of its Boys Markets injunction is justified. Here the trial court did not, and could not, on the record before it make such findings.[2] Therefore the injunction against the International and Welsh, its representative, must be reversed.
 
 III. The Appeal of the Local and Its Officers
 A. The Preliminary Injunction
 
 24
 The Local and its officers, O'Malley and Grzeczka, concede that both the work assignment and discharge disputes were grievable and arbitrable, and that the strike was illegal. Thus they concede that a Boys Markets injunction was appropriate. They contend that the injunction appealed from must be vacated, however, because it is overbroad in three significant respects. As drawn it prohibits all work stoppages, even those which may not be grievable and arbitrable. Moreover even if it is construed to apply only to work stoppages over arbitrable disputes, it is not confined to this specific dispute, but rather is couched in language as broad as the contract. Finally, the Local contends, the injunction is not sufficiently specific to satisfy Rule 65(d) of the Federal Rules of Civil Procedure and sections 4 and 9 of the Norris-LaGuardia Act. 29 U.S.C. §§ 104, 109 (1976). All of these contentions are well taken.
 
 
 25
 The injunction prohibits "any strike, slowdown or any other interference with or impeding of work or operations" at the Employer's plant. Although the arbitration clause in this case is quite broad, it does not require employees to seek arbitration before engaging in sympathy strikes. The injunction, however, is broad enough to prohibit such strikes, and as so drawn is inconsistent with the Supreme Court's ruling in Buffalo Forge Co. v. United Steelworkers of America, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). That case holds that the Boys Markets exception to section 4 of the Norris-LaGuardia Act applies only to strikes over disputes which are subject to the arbitration provisions of the collective bargaining agreement. Even a no strike clause broader than the arbitration clause is not enforceable by injunction in a federal court. 428 U.S. at 407-09, 96 S.Ct. at 3147, 3148. In this case the no strike clause is not broader than the arbitration provision, but rather is a part of that provision. Therefore, even aside from section 4 of the Norris-LaGuardia Act an injunction as broad as the one appealed from herein would be improper.
 
 
 26
 The Employer suggests that what was intended was an injunction as broad as, but no broader than, the no strike agreement in the contract. But even if we so construe it, the injunction is overbroad. In United States Steel Corp. v. UMW, 534 F.2d 1063 (3d Cir. 1976), and Bituminous Coal Operators Ass'n v. UMW, 585 F.2d 586 (3d Cir. 1978), we considered the question when a Boys Markets injunction could be issued to enjoin future strikes over arbitrable disputes. The rule that we adopted is a narrow one. We held
 
 
 27
 (t)hat the district courts' authority under (section) 301 to issue judgments granting Boys Markets injunctions necessarily carries with it the power to make those judgments effective between the parties. But the predicate for the relief we held might be possible is a prior case establishing an enjoinable breach of contract. Only if the court has found both a violation of the contract and a likelihood of a similar violation occurring in the future can the specificity requirement of (section) 9 of the Norris-LaGuardia Act, 29 U.S.C. § 109, be satisfied. And under Boys Markets itself, the underlying dispute must be arbitrable before the breach can be enjoined.
 
 
 28
 Bituminous Coal Operators Ass'n v. UMW, 585 F.2d at 593 (footnote omitted); see United States Steel Corp. v. UMW, 534 F.2d at 1077-78 (setting forth requirements for prospective injunctive relief). Plainly this case does not satisfy the narrow set of circumstances, recognized in Bituminous Coal, in which we were willing to countenance prospective Boys Markets injunctions. Equally plainly, the order appealed from enjoins not only strikes over the work assignment and discharge disputes which produced the work stoppage on August 17, but all future strikes. The injunction as drawn falls within the prohibition of section 4(a) of the Norris-LaGuardia Act, 29 U.S.C. § 104(a), and not within the relitigation corollary with which we refined the Boys Markets exception in Bituminous Coal.
 
 
 29
 What we have said about the overbreadth of paragraph 1 of the injunction requires that that paragraph be vacated. The Local also contends that both paragraphs 1 and 5 are insufficiently specific to satisfy the requirements of Rule 65(d) and of section 9 of the Norris-LaGuardia Act, 29 U.S.C. § 109. We note first that with respect to the specificity of paragraph 1, our opinion in United States Steel Corp. controls:
 
 
 30
 It seems to us that any prospective injunctive decree must tell the local what specific steps it must take to prevent illegal work stoppages from recurring and must tell the parent organization what prophylactic steps it must take to assure that the local fulfills its contractual obligation. A blanket injunction in the language of the arbitration clause places in the hands of the successful (section) 301 plaintiff a weapon by which harassment by contempt citations may take the place of the normal ongoing collective bargaining process. No (section) 301 defendant should be subjected to that risk.
 
 
 31
 United States Steel Corp. v. UMW, 534 F.2d at 1078 (footnote omitted). In addition to the overbreadth defects we noted above, paragraph 1 of the injunction suffers from the defect that it fails to give notice of the precise conduct it enjoins. Moreover, paragraph 5 of the injunction directing the unions "to employ all means at their disposal to insure that this injunction is obeyed" is deficient in the same respect.
 
 
 32
 Paragraphs 1 and 5 of the preliminary injunction therefore must be vacated. Whether in view of changed circumstances since the entry of the preliminary injunction, any pendente lite injunction drawn in compliance with the scope and notice standards we have discussed is still required is a matter which the district court should consider in the first instance.
 
 B. The Contempt Order
 
 33
 As we noted previously, on August 21, 1979, the employer obtained an order directing the defendants and three union members to appear before the court on August 22, 1979 "and show cause why they, and each of them should not be held in contempt of this Court because they and each of them have not obeyed this Court's Temporary Restraining Order of August 20, 1979." No other form of notice was given. At the conclusion of the hearing the court announced that it was imposing a $2500 fine on the Local, and an order was entered in the form quoted herein in Part I. The Local contends that the contempt proceeding was criminal in nature and that the fine was imposed without compliance with the procedural safeguards applicable to such proceedings. Alternatively it urges that even if the contempt was civil in nature, the imposition of the fine was improper.
 
 
 34
 The Local was held in contempt because of its failure to obey the district court's temporary restraining order. Unlike the preliminary injunction subsequently entered in this case, the temporary restraining order has not been challenged by the parties or set aside by this court. Therefore, the contempt, whether civil or criminal, could properly stand. See Latrobe Steel Co. v. United Steelworkers of America, 545 F.2d 1336, 1342 (3d Cir. 1976) (whether contempt judgment survives subsequent avoidance of order underlying it depends on whether the contempt decree was civil or criminal). If, however, the contempt judgment was criminal in nature, there must have been compliance with the applicable procedural safeguards in order for the judgment to stand. Not the least of those safeguards is the provision in Rule 42(b) of the Federal Rules of Criminal Procedure that "(t)he defendant is entitled to a trial by jury in any case in which an act of Congress so provides." An act of Congress provides that "(i)n all cases of contempt arising under the laws of the United States governing the issuance of injunctions or restraining orders in any case involving or growing out of a labor dispute, the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the contempt shall have been committed." 18 U.S.C. § 3692 (1976). There is no evidence in the record of any knowing and intelligent waiver by the Local of the right to a jury trial for criminal contempt. Thus, if this was a criminal contempt, the judgment cannot stand.
 
 
 35
 In this case neither the notice to the defendant nor any colloquy in open court, nor even the form of the judgment, made any specific designation as to whether the contempt proceeding was civil or criminal in nature. Even if it had, on appeal we are required to determine its nature independently rather than rely on the district court's designation. Latrobe Steel Co. v. United Steelworkers of America, 545 F.2d at 1342; cf. Cromaglass Corp. v. Ferm, 500 F.2d 601, 604 (3d Cir. 1974) (court looks to substance of contempt order rather than to form thereof). In making that independent determination we must look primarily to the purpose and character of the sanctions imposed against the contemnor. E. g., Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911); United States v. Spectro Foods Corp., 544 F.2d 1175 (3d Cir. 1976). The differences in the purpose and character of the two varieties of contempt are set forth in our Latrobe Steel opinion.
 
 
 36
 The purpose of criminal contempt is to vindicate the authority of the court. Criminal contempt seeks to punish past acts of disobedience and may be maintained only with the court's approval. Its proceedings are separate from the actions which spawned them. If a criminal contempt action develops from a civil proceeding, it bears a separate caption apart from the civil suit. And the penalties arising out of adjudications of criminal contempt are generally an absolute fine of a specific amount or a determinate period of confinement.
 
 
 37
 On the other hand, the objective of a civil contempt decree is to benefit the complainant. . . .
 
 
 38
 While the Gompers case speaks in terms of a dichotomy between criminal and civil contempt, civil contempt itself may be divisible into two sub-categories which benefit the aggrieved party in distinctive ways. Remedial or compensatory actions are essentially backward looking, seeking to compensate the complainant through the payment of money for damages caused by past acts of disobedience. Coercive sanctions, in contrast, look to the future and are designed to aid the plaintiff by bringing a defiant party into compliance with the court order or by assuring that a potentially contumacious party adheres to an injunction by setting forth in advance the penalties the court will impose if the party deviates from the path of obedience.
 
 
 39
 Latrobe Steel Co. v. United Steelworkers of America, 545 F.2d at 1343-44 (footnotes omitted).
 
 
 40
 In this case the court denominated the $2500 amount as a fine. It is a specific amount payable to the United States. There is no provision for its remission depending upon future events. Its collection confers no remedial or compensatory benefit upon the Employer, the aggrieved party. The order makes no provision with respect to future sanctions. With respect to the specific order which was disobeyed the fine can have no coercive effect, for that temporary restraining order expired by its terms upon the entry of the preliminary injunction which we have vacated. Moreover, there are indications in the record that the district court's primary concern was vindication of its authority. Transcript of Contempt Proceedings at 151-52 (W.D.Pa. Aug. 22, 1979). Finally, the proceeding was commenced with the court's consent by an order to show cause, rather than by a notice of motion from the opposing party.
 
 
 41
 We note, finally, that unlike the contempt judgment found to be civil in Latrobe Steel, which contemplated a daily fine, the instant order imposed only a single fine, of a specific amount, payable to the United States. Latrobe Steel Corp. v. United Steelworkers of America, 545 F.2d at 1344-45. This difference is significant in determining the nature of the contempt order entered in this case. We conclude that it is not possible, applying the standards outlined in Latrobe Steel, to denominate the contempt judgment in this case as anything but criminal. As such, it cannot stand.
 
 IV.
 
 42
 The preliminary injunction will be reversed insofar as paragraphs 1 and 5 purport to bind the International and defendant Welsh. It will be vacated as overbroad and vague insofar as paragraphs 1 and 5 are directed to the Local and defendants O'Malley and Grzeczka, without prejudice to reconsideration by the district court of preliminary injunctive relief against those defendants consistent with this opinion. The judgment of contempt will be reversed.
 
 
 
 [1]
 Section XV of the contract provides in relevant part:
 The purpose of this section is to provide opportunity for discussion of any request or complaint, and to establish procedures for the processing and settlement of grievances.
 Any employee who believes that he has a justifiable request or complaint, shall discuss the request or complaint with his foreman in an attempt to settle same.
 Should the complaint not be settled as a result of the discussion mentioned above or should differences arise between the Company and the Union as to the provisions of this Agreement, other than matters specifically covered by any provision of the Agreement, there shall be no work interruption of any kind, and an earnest effort shall be made to settle such differences through the use of the grievance procedure.
 Agreement between Pittsburgh-Des Moines Steel Co. and United Steelworkers of America, Local Union No. 2789, § XV (1978) (emphasis added).
 
 
 [2]
 Chief Judge Seitz would not reach the question discussed in the text. Given that the district court made no finding that would satisfy Carbon Fuel and no finding that an injunction against the International was necessary to make the injunction against the Local effective, he believes the injunction should be reversed in the circumstances of this case