CATALYTIC, INC.

v.

MONMOUTH & OCEAN COUNTY BUILDING TRADES COUNCIL, Asbestos Workers Local 14, Pat Eiding, Boilermakers Local 28, Dan Kearney, Bricklayers & Cement Masons Local 8, Tom Farrell, Carpenters & Millwrights Local 2018, Frank Kirajacich, Electrical Workers Local 400, Jim Gratton, Ironworkers Local 350, Tom Kepner, Laborers Local 415, William Coleman, Painters Local 694, Robert Newman, Pipefitters Local 9, Tom Sperling, Sheetmetal Workers Local 27, Robert Debartollo, Teamsters Local 469, Fred Potter, Jr., Operating Engineers Local 825, Pat Campbell, all Officers, Agents, Servants, Members or Employees of United Association of Journeymen & Apprentices of the Plumbing and Pipefitting Industry, individually and collectively, all Other Persons Acting in Concert with Defendants, individually or collectively or otherwise participating in their aid.

Appeal of LOCAL 825, INTERNATIONAL UNION OF OPERATING ENGINEERS and Patrick Campbell, Business Manager, Local 825 International Union of Operating Engineers, Appellants.

No. 86–5813.

United States Court of Appeals,
Third Circuit.

Argued June 22, 1987.

Decided Sept. 23, 1987.

As Amended Oct. 29, 1987.

David S. Solomon (argued), David Grossman, Schneider, Cohen, Solomon, Leder & Montalbano, Jersey City, N.J., for appellants.

Francis M. Milone (argued), Steven R. Wall, Philadelphia, Pa., for appellees; Morgan, Lewis & Bockius, of counsel.

Before GIBBONS, Chief Judge, and WEIS and ALDISERT, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

The district court enjoined a number of unions to cease a work stoppage precipitated by Local 825's activities at the plant gates. Among the craft unions only Local 825 appeals, asserting that none of those who refused to work were its members and, consequently, the union could not be enjoined. We will affirm because Local 825 was party to a master agreement and in the alternative, because the injunction as directed to third parties is effective. We also conclude that in the circumstances Local 825's leafletting was not protected activity, but was a signal designed to cause the work stoppage in violation of collective bargaining agreements.

This litigation stems from a jurisdictional dispute between unions and employers at the Oyster Creek Nuclear Generating Plant in Forked River, New Jersey. GPU Nuclear, Inc. operates the plant, which is owned by Jersey Central Power and Light Company. Catalytic, Inc., a general contractor, has provided engineering maintenance service to GPU Nuclear.

To fulfill the terms of the contract with GPU Nuclear, Catalytic employs, as needed, members of various craft unions, including Local 825 of the Operating Engineers. Catalytic had negotiated with the Building Trades Council a collective bargaining agreement governed by the terms of the "General Presidents' Project Maintenance Agreement by Contract." This document recited that the parties "recognized there is an essential difference in the conditions required to perform this type of work .... [I]n order to insure relative equity and uniform interpretation and application, the Unions wish to establish and administer said Collective Agreement in concert each with the other, and all with the Contractor."

The President's Agreement stated that "the Contractor and the Unions agree that, due to the particular work covered by the Agreement, there shall be no lock outs or strikes during the life of this Agreement, and provisions must be made to achieve this end." The agreement acknowledged that GPU may limit the scope of work for assignment. It provided that the "Unions and the Contractor understand that the owner may choose to perform ... any part or parts of the work necessary on his project with due consideration given to achieving the highest maintenance standards and harmonious working conditions." The contract further endorsed "the concept that jurisdictional disputes cannot ... interfere with the efficient and continuous operations required in the successful application of the intent of this agreement."

In addition to non-strike, non-lock out and non-work stoppage clauses, the agreement also included a grievance procedure that established arbitration as a forum of last resort. An addendum to the contract provided that the "Owner's specialty shops, such as ... crane services ... will support building trades crafts by providing the required support services." The presidents of the craft unions, including the Operating Engineers, signed the contract and representatives of the various locals approved the addendum.

At the time this dispute arose, employees of the owner, Jersey Central, were manning both mobile and stationary cranes at the job site. When Local 825 observed this practice, it insisted that its members be assigned to operate the mobile cranes. On May 20 and 21, 1986, as a result of picketing by Local 825 over this issue, the other craft union members on the site engaged in a work stoppage.

On June 13, 1986, Local 825 members appeared at the plant's entrances and handed out leaflets that protested assignment of mobile crane work to "non-building

trades" employees. The body of the handbill charged Jersey Central and GPU Nuclear with being "unfair" to Local 825. In much smaller type at the bottom, the flyer stated that "[o]ur dispute is only with GPU Nuclear and [Jersey Central]. We do not seek to enmesh any other employer in this dispute, and we do not seek to induce or encourage an individual employed by any person engaged in commerce to cease doing business with any other employer." At the time of the picketing and handbilling and for some time before those incidents, no member of Local 825 actually worked at the Oyster Creek plant.

On application of Catalytic, the district court granted a temporary restraining order. After a hearing, the court issued a permanent injunction directing the parties to arbitrate the dispute over the provision of the collective bargaining addendum permitting support services by the owner. The unions were enjoined from ordering their members not to work or from taking any action that would hinder Catalytic's employees in performing their duties. Local 825 and the other craft unions were prohibited from "picketing, handbilling at the job site, and/or otherwise inducing or permitting or in any other manner interfering with persons attempting to enter or leave the Oyster Creek Nuclear Generating Station."

The district court made the following findings of fact: (1) Catalytic and defendant unions (including Local 825) were parties to a collective bargaining agreement; (2) the agreement prohibited strikes and picketing; (3) defendant unions other than Local 825 engaged in a work stoppage precipitated by Local 825's picketing and leafletting; (4) the dispute was over working conditions and terms, and was subject to the grievance-arbitration procedure set out in the collective bargaining agreement.

Only Local 825 has appealed. It contends that no collective bargaining agreement was in effect in May and June 1986; moreover, even if there had been such a contract, the district court abused its discretion in granting an injunction because Local 825 did not join in the strike or work

stoppage. Finally, the union asserts that the handbilling was protected activity under the Constitution and National Labor Relations Act.

## I.

Although the Building Trades Council stipulated in writing that the pre-existing labor agreement with the craft unions extended to September 1, 1988, Local 825 maintains that it had not signed an extension with Catalytic because the owners had refused to acquiesce in the demand that Operating Engineers operate the mobile cranes. The district court, however, found that the bargaining agreement in fact continued beyond the stated expiration date of February 28, 1986. Under past practice, the collective bargaining agreement had continued in effect without regard for technical expiration dates while the parties negotiated a new extension.

Catalytic's director of labor relations testified that an uninterrupted collective bargaining relationship with the craft unions had existed since March 1983, notwithstanding that several craft unions had failed to sign extensions at various times during the three-year period. Customarily, negotiations often had commenced only after the technical expiration of the previous extension. The court also noted that all defendant unions except Local 825 conceded the existence of current collective bargaining agreements with Catalytic, even though several locals had not signed extensions beyond February 1986. The district judge commented, "I find no way to distinguish your local [Local 825] from the other locals on that point."

In addition, Catalytic's project manager testified without contradiction that in March 1986 Local 825 had protested because one of its members had not been assigned to a job which was given to a member of another craft union. Local 825's complaint, which occurred after the collective bargaining agreement had allegedly expired, was inconsistent with the union's position at trial that no agreement with Catalytic was in effect. The court observed, moreover, that although the

agreement specifically required a party to give notice of termination in order to end the relationship, Local 825 had never done so.

Finally, the court saw no difficulty in requiring Local 825 to resolve its grievance over crane operators during negotiations for a new contract. The proposed agreement was not contemplated as simply another extension, but rather was designed to create a more comprehensive relationship among craft unions and contractors at Oyster Creek, including Local 825 and Catalytic.

■ Based on the record before the district court, we conclude that the finding that Local 825 and Catalytic were parties to a viable collective bargaining agreement was not clearly erroneous.

## II.

Local 825 contends that the district court abused its discretion in granting the injunction.

*Boys Markets, Inc. v. Retail Clerks Union, Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), held that federal courts have power under § 301 of the National Labor Management Relations Act, 29 U.S.C. § 185, to enforce an agreement to arbitrate unresolved grievances and to enjoin a work stoppage. In that case the district court ordered the parties to arbitrate and barred a strike, all picketing in the vicinity of the petitioner's place of business, and any attempts by the union to induce the employees to strike or refuse to perform their services. *See id.* at 240, 90 S.Ct. at 1586–87.

The Supreme Court concluded that the "literal terms [of the section prohibiting injunctions in labor disputes] of the Norris-LaGuardia Act must be accommodated to the subsequently enacted provisions of § 301(a) of the Labor Management Relations Act and the purposes of arbitration." 398 U.S. at 250, 90 S.Ct. at 1592. The Court reasoned that "the very purpose of arbitration procedures is to provide a mechanism for the expeditious settlement of industrial disputes without resort to strikes,

lockouts, or other self-help measures." That aim is largely subverted "if there is no immediate, effective remedy for those very tactics that arbitration is designed to obviate." *Id.* at 249, 90 S.Ct. at 1591.

*Buffalo Forge Co. v. United Steelworkers of America*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), however, disapproved an injunction against a sympathy strike that allegedly violated a no-strike clause. The Court distinguished *Boys Markets* because the *Buffalo Forge* strike was "not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract." *Id.* at 407, 96 S.Ct. at 3148 [emphasis in original]. Neither the cause of the strike nor the dispute underlying it was subject to the grievance procedures in the collective bargaining agreement.

■ As noted above, the district court here found as a fact that the controversy fell within the scope of the grievance procedure. Local 825 argues that its dispute is solely with GPU Nuclear (or Jersey Central). Nevertheless, assignment of the work that the union requests is a subject of the collective bargaining agreement. That the controversy may also implicate a non-party—Jersey Central or GPU Nuclear—does not remove the matter from the purview of Catalytic's contract. Local 825 cannot confine its demand to one of the two employers to the exclusion of the other.

The President's Maintenance Agreement emphasizes that unique conditions mandate that no work stoppage occur—particularly those arising from jurisdictional disputes. The agreement, moreover, sets forth various means to achieve that end, including arbitration. GPU Nuclear and Jersey Central also have collective bargaining agreements with the electricians' union, whose members operate the mobile cranes. The real dispute in this case is a jurisdictional one—whether the operating engineers or the electricians' union members should work the mobile cranes.

Local 825 contends that because none of its members engaged in a strike or work stoppage, *Boys Markets* does not govern

here. But the union reads that case too narrowly. In amplifying the desirability of arbitration, the Court observed such procedures would discourage "strikes, lock outs, or other self-help measures" for which there must be an "immediate, effective remedy." 398 U.S. at 249, 90 S.Ct. at 1591.

In the case at hand, the handbilling at the plant gate constituted self-help, triggering a work stoppage just as effectively as the picketing some weeks earlier. The measure was designed to bring pressure on Catalytic in precisely the same manner as a strike and, consequently, came within the ambit of the *Boys Markets* rationale. The special provisions of the President's Agreement augment the factors counselling application of *Boys Markets* in this case.

Even if we accept Local 825's contention that *Boys Markets* does not apply because its members were not employed at the time, the other craft unions unquestionably engaged in a work stoppage and, therefore, the injunction would have to be sustained as it applies to them. Indeed, the other unions have not appealed, and the injunction remains effective against them.

This valid order against the other unions presents an alternative basis for upholding the injunction against Local 825. As we pointed out in *Pittsburgh-Des Moines Steel Co. v. United Steelworkers of America*, 633 F.2d 302, 307 (3d Cir.1980), when an injunction has issued against a party to a contract, to prevent a violation "there must be authority to issue injunctive relief even against third parties where such relief is necessary." In that case we said, moreover, that orders could be made against third parties when "merely helpful[ ] in effectuating the relief against the contracting party in default." We concluded that the basis for relief was "not culpability, but practical necessity." *Id.*

In *United States v. New York Telephone Co.*, 434 U.S. 159, 172, 98 S.Ct. 364, 372, 54 L.Ed.2d 376 (1977), the Supreme Court, citing the All Writs Act, 28 U.S.C. § 1651, reiterated the power of the federal courts to issue such orders "as may be necessary or appropriate to effectuate and prevent the frustration of orders it has previously issued in its exercise of jurisdiction otherwise obtained." That power has been used even against third persons not parties to the underlying dispute. *See Bullock v. United States*, 265 F.2d 683 (6th Cir.), *cert. denied*, 360 U.S. 909, 79 S.Ct. 1294, 3 L.Ed.2d 1260 (1959).

No attenuated exercise of compulsion is present in this case. Local 825 is not only joined as a party to the suit but is a signatory to the contract as well. The participants expressly covenanted to administer the agreement in "concert, each with the other [union], and all with the Contractor." Activity promoting disharmony is not acting in concert with this program. *See* Fed. R.Civ.P. 65(d) (An injunction is binding not only on the parties but also "those persons in active concert or participation with them who receive actual notice of the order.") *See also Regal Knitwear Co. v. NLRB*, 324 U.S. 9, 14, 65 S.Ct. 478, 481, 89 L.Ed. 661 (1945) (injunction not only binds the defendants but also those parties "identified with them in interest, in 'privity' with them, represented by them or subject to their control"); *Chase Nat'l Bank v. City of Norwalk*, 291 U.S. 431, 436, 54 S.Ct. 475, 477, 78 L.Ed. 894 (1934); *Thompson v. Freeman*, 648 F.2d 1144, 1147 (8th Cir. 1981).

We conclude that in these circumstances the court has power to enjoin conduct by third persons—in this case, Local 825 and its officers—that effectively precipitates action frustrating the arbitral process, even if that activity might not come within the boundaries of the *Boys Markets* exemption. We uphold the injunction on this alternative basis as well.

We also reject the contention that Pat Campbell, the business manager of Local 825, should not have been included among the defendants enjoined. As we observed in *Wilkes-Barre, Publishing Co. v. Newspaper Guild of Wilkes-Barre Local 120*, 647 F.2d 372, 378 (3d Cir.1981), *cert. denied*, 454 U.S. 1143, 102 S.Ct. 1003, 71 L.Ed.2d 295 (1982), "[u]nion officials are joined routinely in § 301(a) actions seeking the injunctive and declaratory relief permitted by *Boys Markets*."

## III.

Local 825 argues that its handbilling was protected activity under the Constitution and the National Labor Relations Act. The union maintains that picketing differs from handbilling because of the absence of patrolling and also because the presence of a picket line may induce action irrespective of the nature of the ideas being disseminated.

In commenting on the evidence, the district judge said, "I'm just focusing on handing out leaflets at the plant gate, which we have seen for three days has had the effect of a picket line, in effect, because nobody would cross it, and apparently causes great concern on the part of the employees about going in there." Counsel for one of the unions commented during argument in the district court about the handbilling, "It's a signal. There's no question about that."

The National Labor Relations Board uses the term "signal picketing" to describe activity short of a true picket line which conveys to neutrals that the union solicits their sympathetic action. *See International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local No. 433 v. NLRB*, 598 F.2d 1154, 1158 n. 6 (9th Cir. 1979); *see also NLRB v. Denver Bldg. & Constr. Trades Council*, 341 U.S. 675, 690, 71 S.Ct. 943, 952, 95 L.Ed. 1284 (1951) ("That the placard was merely such a signal, tantamount to a direction to strike, was found by the Board"); *cf. International Bhd. of Electrical Workers v. NLRB*, 341 U.S. 694, 700, 71 S.Ct. 954, 958, 95 L.Ed. 1299 (1951) ("no finding here that the picketing and other activities of petitioners were mere signals in starting and stopping a strike").

The record shows that the handbilling at the plant gates effectively caused work stoppages. When the plant reserved a gate exclusively for Catalytic, Local 825 leafletted another entrance, but the employees refused to enter the site.[1]

Local 825 asserts that its leafletting is protected under the publicity proviso of the National Labor Relations Act. This clause states that the Act should not be construed "to prohibit publicity, other than picketing, for ... advising the public ... that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, *as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer ... not to perform any services, at the establishment of the employer engaged in such distribution.*" 29 U.S.C. § 158(b)(4) (emphasis supplied). The publicity proviso follows the provision that authorizes the Board to secure an injunction to restrain secondary picketing.

Local 825 maintains that the primary employer, GPU Nuclear or Jersey Central, was the target of this publicity and that Catalytic was only a secondary object. But the district court's finding that the leafletting effectively induced a work stoppage of Catalytic employees places Local 825 outside the scope of the publicity proviso.[2]

The simple cause-and-effect of the appearance of leafletters and work stoppages eloquently testified to the purpose of the enterprise. The union calls our attention to the wording of the leaflets which cites the grievance against Jersey Central and

---

1. *See NLRB v. Local 825, A, B, C, D, Int'l Union of Operating Engineers*, 659 F.2d 379, 386 (3d Cir.1981) (general contractor may lawfully force a union to picket only designated separate gates).

2. Local 825 suggests for the first time on appeal that its handbilling represents primary activity and, therefore, it is not prohibited under the secondary boycott provisions of the National Labor Relations Act, 29 U.S.C. § 158(b)(4). The presence of the primary employer during the disputed activity is not dispositive of the charac-

ter of that activity. It may be classified as primary so long as it "discloses clearly that the dispute is with the primary employer." *See NLRB v. Local 825, A, B, C, D, Int'l Union of Operating Engineers*, 659 F.2d 379, 384 (3d Cir.1981). The district court found that the union failed to make its primary objective clear. Although the onus purportedly lay with the owners/operators of the plant, in reality Local 825 sought to coerce GPU Nuclear and Jersey Central through Catalytic.

GPU Nuclear. But the text of the leaflets did not restrict the district court's duty to define Local 825's purpose. The union's "argument ignores the wide latitude open to triers of fact to make factual determinations on the basis of rational inferences which arise from the nature, location, and effect of picketing." *American Radio Ass'n, AFL–CIO v. Mobile Steamship Ass'n, Inc.*, 419 U.S. 215, 232, 95 S.Ct. 409, 419, 42 L.Ed.2d 399 (1974).

The repeated work stoppages demonstrated that Local 825 sought to persuade the other craft unions to violate their contractual no strike obligation. If the union lacked this intent, it could have phrased the leaflets to urge Catalytic employees not to engage in a work stoppage. The carefully vague and legalistic statement on the flyer carried no such message and, indeed, its very tone may have been a signal in itself.

As a general matter, peaceful picketing and leafletting are expressive activities protected by the first amendment; however, the courts regularly have rejected the view that persons who wish to "propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *United States v. Grace*, 461 U.S. 171, 177–78, 103 S.Ct. 1702, 1707, 75 L.Ed.2d 736 (1983). Reasonable time, place, and manner restrictions may be imposed under certain conditions.

In *International Longshoremen's Ass'n, AFL–CIO v. Allied Int'l, Inc.*, 456 U.S. 212, 102 S.Ct. 1656, 72 L.Ed.2d 21 (1982), the Court said: "We have consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) is protected activity under the First Amendment. ... It would seem even clearer that conduct designed not to communicate but to coerce merits still less consideration under the First Amendment." *Id.* at 226, 102 S.Ct. at 1664. The Court noted favorably Justice Stevens' comment in *NLRB v. Retail Store Employees Union, Local 1001*, 447 U.S. 607, 619, 100 S.Ct. 2372, 2380, 65 L.Ed.2d 377 (1980), that "[t]he statutory ban in this case affects only that aspect of the union's effort to communicate its views that calls for an automatic response to a signal, rather than a reasoned response to an idea." *Id.* at 226 n. 26, 102 S.Ct. at 1665 n. 26 (quoting *NLRB v. Retail Store Employees Union, Local 1001*, 447 U.S. 607, 619, 100 S.Ct. 2372, 2380, 65 L.Ed.2d 377 (1980) (Stevens, J., concurring)). *Cf. Florida Gulf Coast Bldg. & Constr. Trades v. NLRB*, 796 F.2d 1328, 1334 & n. 6 (11th Cir.1986), *cert. granted*, — U.S. ——, 107 S.Ct. 3182, 96 L.Ed.2d 671 (1987).

The Supreme Court observed in *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 912, 102 S.Ct. 3409, 3425, 73 L.Ed.2d 1215 (1982), that it has "recognized the strong governmental interest in certain forms of economic regulation, even though such regulation may have an incidental effect on rights of speech and association." Specifically, the Court mentioned that secondary boycotts and picketing could be prohibited. Noting that various terms have been used to describe the government's interest, the Court asserted that a regulation is sufficiently justified "if it is within the constitutional power of the government; if it furthers an important or substantial government interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." 458 U.S. at 912 n. 47, 102 S.Ct. at 3425 n. 47.

In the case at hand, the restrictions on leafletting were quite limited and applied only to a very small area—i.e., the plant gates. The prohibition was not applied to the content of the flyers and ample alternative means remained for the union to disseminate its views. No time and manner restrictions were imposed on leafletting and only a minor proscription applied to location. The reality is that the union's leafletting was a signal to the other unions to engage in a work stoppage contrary to the public policy expounded in *Boys Markets* of encouraging resolution of labor disputes by arbitration.

Even if we accept the union's representation that its dispute rests with GPU Nuclear and Jersey Central, the leafletting had to

reckon with the prohibition of secondary activity by the National Labor Relations Act. That issue, however, has not been presented for our consideration.[3]

Accordingly, the judgment of the district court will be affirmed.

3. That the activity may come within the scope of the National Labor Relations Act does not preclude a suit under § 301. "When, however, the activity in question also constitutes a breach of a collective-bargaining agreement, the Board's authority 'is not exclusive and does not destroy the jurisdiction of the courts in suits under § 301.'" *William E. Arnold Co. v. Carpenters District Council of Jacksonville and Vicinity,* 417 U.S. 12, 16, 94 S.Ct. 2069, 2072, 40 L.Ed.2d 620 (1974) (quoting *Smith v. Evening News Ass'n,* 371 U.S. 195, 197, 83 S.Ct. 267, 269, 9 L.Ed.2d 246 (1962)); *Amalgamated Ass'n of Street, Elec. Ry & Motor Coach Employees v. Lockridge,* 403 U.S. 274, 298, 91 S.Ct. 1909, 1924, 29 L.Ed.2d 473 (1971).