**WARSHAWSKY & COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Ironworkers Local 386, Intervenor.**

No. 98–1277.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 8, 1999.

Decided July 9, 1999.

Michael W. Duffee argued the cause for petitioner. With him on the briefs was John N. Raudabaugh.

Steven B. Goldstein, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Linda Sher, Associate General Counsel, John D. Burgoyne, Acting Deputy Associate General Counsel, and David Habenstreit, Supervisory Attorney.

Terrance B. McGann argued the cause for intervenor. With him on the brief was Travis J. Ketterman. Collins P. Whitfield entered an appearance.

Before: WALD, SILBERMAN, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

Dissenting Opinion filed by Circuit Judge WALD.

SILBERMAN, Circuit Judge:

Warshawsky & Company petitions for review of an order of the National Labor Relations Board dismissing a secondary boycott complaint filed against Ironworkers Local 386. We grant the petition.

## I.

Warshawsky (the Company) sells automobile parts and accessories and is currently constructing a warehouse and mail order facility in LaSalle, Illinois. The Company retained G.A. Johnson & Sons, Inc. as its general contractor for the project. Johnson in turn subcontracted with various other companies, all of whom maintained collective bargaining contracts with the building trade unions that represent their employees. Throughout the period relevant to this case, Johnson and the subcontractors worked at the LaSalle site from approximately 7 a.m. to 3:30 p.m. every weekday, and occasionally on Saturday. In March of 1997, Warshawsky retained Automotion, Inc. to install rack and conveyor systems at the site. In response, Iron Workers Local 386, which represents Automotion's employees and had no dispute with Johnson or any of the subcontractors, engaged in "area standards" picketing of Automotion at the construction site on March 5. The union stopped later that day after being told that Automotion was not yet working at the site. One week later, Warshawsky's Vice President of Human Resources sent the union's business agent a letter stating that a "reserve gate" had been established at the site for Automotion, and that any subsequent picketing of Automotion should be conducted only when Automotion was working on the site: Monday through Friday from 4 p.m. to 6 a.m., and all day Sunday. Automotion began work at the site according to this schedule on the same day.

The next morning, at around 6:40 a.m., various union agents stationed themselves in close proximity to the LaSalle site on a road that was used primarily by persons going to and from the site. The site itself was not open to members of the general public. As employees of Johnson and its subcontractors approached the construction site in their automobiles, the union

agents distributed the following handbill:[1]

**AUTOMOTION, INC.
IS DESTROYING
THE STANDARD OF
WAGES FOR
HARD-WORKING
UNION MEMBERS**

**AUTOMOTION, INC.
PAYS SUBSTANDARD
WAGES AND FRINGE BENEFITS.**

**IGNORING THE AREA STANDARDS
THREATENS THE EFFORTS AND SACRIFICES
OF ALL UNION MEMBERS.**

Iron Workers Local 386 is currently engaged in a labor dispute concerning the failure of Automotion, Inc. to pay the area standard wages and fringe benefits. We are appealing only to the general public. We are not seeking any person to cease work or to stop making deliveries.

The union agents also spoke briefly with the employees to whom they gave the handbill, although we have no direct evidence of what was said.

This activity lasted for about four hours, and resulted in the employees of Johnson and its subcontractors refusing to enter the site and refusing to perform services for their employers. The union agents engaged in the same conduct at the same times on four of the next six days, resulting each day in employees of Johnson and its subcontractors refusing to work. None of that conduct occurred while Automotion, or any of its employees, suppliers, or subcontractors, were working at the site.

The General Counsel, responding to an unfair labor practice charge filed by Warshawsky, issued a complaint alleging that the union's conduct violated § 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act.[2] The union's answer admitted that its agents handbilled and spoke to employees of Johnson and its subcontractors, but characterized that conduct as a "lawful informational picket." The parties subsequently stipulated to the facts as set forth above and agreed that those facts would serve as the complete record of the case to be submitted to the ALJ for his decision without a hearing. The ALJ granted the union's motion to amend its answer two days before briefs were to be filed, which Warshawsky but not the General Counsel

1. The actual handbill is in an appendix to our opinion. As will be apparent, the caveat at the bottom is in very small print indeed.

2. Those sections provide that it is an unfair labor practice for a labor organization or its agents

(i) to engage in, or to *induce* or *encourage* any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting com-

merce, where in either case an object thereof is—

. . . .

(B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 159 of this title . . .

29 U.S.C. § 158(b)(4)(i), (ii)(B) (1994) (emphasis added).

opposed, to substitute the word "handbilling" for "picket."[3]

The ALJ determined that because there was no direct testimony as to what was said by the union agents to the neutral employees and nothing else in the record supported an inference that the union "induced" or "encouraged" the work stoppage, the General Counsel had not met his burden of proof. The ALJ's decision appears to have been strongly influenced by his conclusion that the handbilling engaged in by the union—as opposed to picketing—was "pure expressive" activity and is therefore entitled to some measure of First Amendment protection. Although he described the handbill as strident in tone, according to him it did no more than truthfully advise members of the "public" (*i.e.,* the neutral employees of Johnson and its subcontractors) of Automotion's wages and benefits. He accordingly discounted the suspicious timing of the handbilling— that it took place when Automotion's employees were not present. And he also concluded that the apparent connection between the handbilling and the work stoppage was insufficient as a matter of law to prove inducement.

The Board affirmed the ALJ's findings and conclusions and adopted the order dismissing the complaint. *See Iron Workers Local 386 (Warshawsky & Co.),* 325 N.L.R.B. No. 141, 1998 WL 251581 (May 14, 1998). Chairman Gould concurred separately. He thought that the case was a close one; the evidence arguably could support an inference that the union "was indeed making an appeal, through a care-

ful wink and a nod, for the employees to engage in a work stoppage." He noted particularly the timing of the handbilling when the only recipients would be neutral employees, the text of the handbill, and the resulting work stoppage. But based on Board precedent limiting the "nod, wink, and a smile" theory, *see Building & Constr. Trades Council of Tampa (Tampa Sand & Material Co.),* 132 N.L.R.B. 1564, 1565–66, 1961 WL 15896 (1961), he concluded that the facts of the instant case, involving a handbill with a disclaimer, together with an absence of evidence as to the content of the conversations between the union and the employees, did not satisfy the General Counsel's burden of proving unlawful inducement or encouragement.

## II.

■ As noted, the ALJ (whose opinion the Board adopted) relied significantly on the First Amendment in concluding that the union did not induce or encourage the employees of the neutral employers to engage in a secondary strike. In the ALJ's words, the looming constitutional issue meant that "analysis must proceed with care." The ALJ's reasoning is not all that clear to us; it is as if the First Amendment acts as a *deus ex machina* directing his factfinding.[4] He presumably thought that to prohibit a union from engaging in "area standards" handbilling of neutral employees might violate the union's First Amendment rights, and therefore the constitutional avoidance canon suggests that the words "induce or encourage" in

---

**3.** Warshawsky argues that the ALJ erred in granting the motion because the last-minute change from "picket" to "handbilling" prejudiced Warshawsky, and that even if the motion were properly granted, the ALJ erroneously failed to consider the original answer as evidence that the union's conduct constituted picketing. Because we conclude that the union's conduct violated the statute even accepting the amended answer, and without even considering the original answer as evidence of picketing, we need not address these contentions.

**4.** Our dissenting colleague is no more forthcoming as to just how the First Amendment affects her analysis. It would appear that she is of the view that circumstantial evidence should be thought less probative than direct evidence in this setting, but she does not explain why. *Cf. Crawford–El v. Britton,* 93 F.3d 813, 818 (D.C.Cir.1996) (en banc) ("[T]he distinction between direct and circumstantial evidence has no direct correlation with the strength of the plaintiff's case."), *rev'd on other grounds,* 523 U.S. 574, 118 S.Ct. 1584, 1595, 140 L.Ed.2d 759 (1998).

§ 8(b)(4)(i) should be interpreted, and applied, narrowly so as not to proscribe the handbilling involved in this case. We think the First Amendment is not at all implicated and once it is put aside, the Board's finding can be judged in accordance with the standard substantial evidence test.

The Supreme Court has emphatically said that "[t]he prohibition of inducement or encouragement of secondary pressure by § 8(b)(4)[i] carries no unconstitutional abridgment of free speech," *International Brotherhood of Elec. Workers, Local 501 v. NLRB*, 341 U.S. 694, 705, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). And in *Electrical Workers*, the Court also recognized that "[t]he words induce or encourage are broad enough to include in them *every form of influence and persuasion.*" *Id.* at 701–02, 71 S.Ct. 954 (emphasis added). It follows that the First Amendment does not protect communications directed at—and only at—the neutral employees merely because the form of communications is handbilling and conversations.[5] Indeed, the Board's brief concedes that a violation of the Act would have been established "if the handbilling had [explicitly] requested neutral employees to cease work, or if the record showed that the union had orally induced or encouraged such a work stoppage...."

The Board (both the ALJ and the Board's brief) relies heavily on the Supreme Court's decision in *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building & Construction Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988), in which the Court did pivot on the First Amendment—using the canon of constitutional avoidance—to construe the secondary boycott provisions of the Act not to reach peaceful handbilling directed to *consumers* at a shopping mall. There the union's primary dispute was with a construction company retained to build a department store in the mall. *See id.* at 570, 108 S.Ct. 1392. The handbill asked customers not to shop at any stores in the mall until the mall owner (DeBartolo) promised that all of its tenants would use only contractors who pay fair wages, and made clear that the union was seeking only a consumer boycott. The Board found that the handbilling "coerced" the mall tenants, in the words of § 8(b)(4)(ii)(B), by putting economic pressure on them through the appeal to consumers. The Supreme Court rejected the Board's interpretation of § 8(b)(4)(ii)(B) to reach such consumer directed handbilling in part to avoid the serious constitutional question that would arise.

We think *DeBartolo*, and the constitutional issue the Board's statutory interpretation would have presented there, is fundamentally different because, as the Supreme Court observed, the mall's potential customers were being urged "to follow a *wholly legal* course of action, namely, not to patronize the retailers doing business in the mall." *Id.* at 575, 108 S.Ct. 1392 (emphasis added). The issue in the case was whether that sort of appeal to the consumers—which obviously implicates the First Amendment—could be thought to *threaten, coerce, or restrain* the mall tenants to cease doing business with another (DeBartolo) within the meaning of § 8(b)(4)(ii)(B). By contrast, the conduct sought by a union that directly *induces* or encourages a secondary strike is itself unlawful under § 8(b)(4)(i). *See* 29 U.S.C. § 158(b)(4)(i) (providing that it is an unfair labor practice for a labor organization or its agents "to engage in ... a strike ... [the object of which is] forcing or requiring any person ... to cease doing business with any other person"). The obvious implication of *DeBartolo*, consistent with the Court's prior precedent, is that an appeal limited to employees of a neutral employer which reasonably could be found to be an inducement to engage in a secondary strike is quite another matter; it does not raise any constitutional problems.

5. The dissent, post at 959, misconstrues this rather unexceptionable statement.

The ALJ, again drawing on *DeBartolo,* suggested a related basis for his decision. *DeBartolo* involved the construction of the so-called publicity proviso of 8(b)(4), which states that nothing in § 8(b)(4)

> shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.

29 U.S.C. § 158(b)(4) (1994). The Board in *DeBartolo* had argued the proviso was an exception to the secondary boycott provisions, and therefore if a union was engaging in public handbilling, but handbilling that did not qualify under the proviso because it was not calling attention to a "distributor" of goods with whom a union has a labor dispute, it was implicitly banned (as coercive). The Court rejected that construction—in part, as we noted, for constitutional reasons—pointing out that the proviso was not an exception to a broad handbilling ban, but rather a clarification as to the meaning of the section's bar on coercion. *See DeBartolo,* 485 U.S. at 582, 108 S.Ct. 1392.

The ALJ, keying on the Supreme Court's description of the proviso as serving a clarification function, pointed to the language "public, including consumers *and* members of a labor organization," 29 U.S.C. § 158(b)(4) (emphasis added), and reasoned that handbilling appeals to union members are entitled to the same constitu-

tional protection as those directed to consumers. They are, after all, as Congress recognized, both parts of the public. Therefore the constitutional grounds for construing the handbilling restriction narrowly as it relates to consumer handbilling apply equally to handbilling directed at union members.[6] We think that reasoning is flawed. It ignores the Supreme Court's cases which draw a distinction between urging consumers to engage in a lawful boycott and inducing union members to engage in an unlawful secondary strike.

\* \* \* \*

We come then to the Board's finding that the union did not "induce" the neutral employees to stop work. Petitioner argues that the Board's finding is not supported by substantial evidence, which is another way of saying that no reasonable factfinder could have made such a finding. *See Allentown Mack Sales & Serv. v. NLRB,* 522 U.S. 359, 118 S.Ct. 818, 822, 139 L.Ed.2d 797 (1998). This is not a credibility case; there was no testimony. Nor did the Board employ any presumptions, so we need not consider whether such would have been reasonable. *See id.* 118 S.Ct. at 828. The case turns only on the reasonableness of the inferences the Board did, and did not draw, from the raw stipulated facts. And "[w]hen the Board purports to be engaged in simple factfinding, unconstrained by substantive presumptions or evidentiary rules of exclusion, it is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Id.* at 829.

We think that the evidence does "fairly demand" the inference that the union sought to induce the neutral employees to walk off the job site. The handbills themselves, the time, place, and manner of their distribution, the simultaneous conversa-

---

**6.** The ALJ thought the same holds true (as in this case) for a union's handbilling of mem-   bers of a different labor organization.

tions between the union agents and the neutral employees, and the subsequent response of those employees all combine to paint only one plausible picture. The ALJ unreasonably took each piece of evidence, analyzed it separately—not even accurately in our view—and concluded that no one piece sufficed, never asking whether the totality of facts pointed in only one direction.

To start with the handbill, the union argued that it specifically stated that "we are appealing only to the general public. We are not seeking any person to cease work or to stop making deliveries." But that caveat is contained in only very small print at the bottom of the handbill. The Board has not in the past credited similar disclaimers in the face of circumstances suggesting that the disclaimer is merely a legal cover. *See National Ass'n of Broad. Employees, Local 31 v. CBS Inc.*, 237 N.L.R.B. 1370, 1376, 1978 WL 7966 (1978) (concluding that purported disclaimer at bottom of handbill was a "self-serving disavowal" given the manner in which the handbill was distributed), *enforced*, 631 F.2d 944 (D.C.Cir.1980); *see also Catalytic, Inc. v. Monmouth & Ocean County Building Trades Council*, 829 F.2d 430, 432, 435 (3d Cir.1987) (dismissing disclaimer on handbill virtually identical to disclaimer at issue here as a "carefully vague and legalistic statement" whose tone may actually have sent a signal to the neutral employees to cease work); *cf. International Brotherhood of Elec. Workers, Local 453 v. Southern Sun Elec. Corp.*, 252 N.L.R.B. 719, 723, 1980 WL 12469 (1980) (stating that union's self-serving disclaimer of picketing for recognitional purposes is not determinative of whether union was engaged in lawful picket).

As the ALJ put it, the main language of the handbill contained a strident attack on Automotion's substandard wages and, most significantly, the lugubrious prediction that "Ignoring the Area Standards Threatens the Efforts And Sacrifices Of *All* Union Members" (emphasis added), which clearly tells the recipients of the handbill that they should regard this matter as one in which they *as union members* have a stake. And being so informed there is only one possible action they can take that will contribute to the cause.

Indeed, Congress itself indicated that this sort of handbill would be at least evidence of inducement, if not necessarily conclusive evidence. The publicity proviso assumes that handbills, or like publicity, advising members of a labor organization that a secondary employer is distributing products produced by an employer with whom the union has a primary dispute can have the "*effect of inducing*" a secondary employee not to perform services. 29 U.S.C. § 158(b)(4) (emphasis added). That the proviso does not afford a defense in this case[7] has no bearing on whether this generic type of handbilling is at least evidence of inducement.

Second, the handbilling was *de facto* directed only at the neutral employees. It took place on an access road to the construction site (the common situs) only at times when the employees of Johnson and its subcontractors—the neutral employees—were reporting for work and during which, as the union knew, Automotion was not working. The ALJ himself determined at one point in his opinion that "the stipulated facts leave scant room for any conclusion that the handbills had been intended for anyone other than persons reporting for work at the LaSalle project" and that "[t]here is no basis in the stipulation that would allow *even an inference* that handbills had been actually distributed to anyone else." *WARSHAWSKY*, 325 N.L.R.B. No. 141, at 6 (emphasis added). Inexplicably, the ALJ later drew precisely

---

7. The proviso cannot constitute a defense for the union in this case most obviously because there was a work stoppage. The ALJ thought that it did not apply also because the handbills did not advise the public that Warshawsky was distributing Automotion's "products" (or perhaps that Warshawsky could not even be thought a "distributor").

that forbidden inference, remarking that nothing in the evidence ruled out the possibility that the union handbilled non-employees who may have tried to enter the construction site (a mystery food vendor or some construction-site tourists?). *See id.* at 9. Based on the ALJ's own initial finding, which seems unassailable, we do not see how his latter inference can possibly be justified.

Then there are the conversations between the union agents and the employees. The ALJ was apparently under the impression that because there is no testimony as to the content of those conversations, the *fact* that they took place is of *no* moment or significance. But we think that conclusion is, as an evidentiary matter, ridiculous. It may well be that those conversations, standing alone, would be of little relevance—but they did not stand alone. A reasonable factfinder would have evaluated the existence of the conversations in light of the evidence already set forth: a handbill distributed exclusively to the very employees who later ceased work and which calls attention to the efforts and sacrifices of all union members. In such a case, the mere fact of a conversation between the alleged inducers and those allegedly being induced can speak volumes. *See, e.g., International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local No. 433 v. NLRB,* 598 F.2d 1154, 1159–60 (9th Cir.1979) (enforcing Board's order finding unlawful inducement in part based on conversations at neutral employer's office gate between union agent and neutral employees who failed to report for work later that day, even though there was no testimony regarding the content of the conversations). We also think the Board's and the union's reliance on precedent holding a union not to have violated the Act based on conversations between a union and neutral employees, *see, e.g., Carpenters Local 316 (E & E Dev. Co.),* 247 N.L.R.B. 1247, 1248–49, 1980 WL 11157 (1980); *Gould, Inc.,* 238 N.L.R.B. 618, 622, 1978 WL 8073 (1978), *enforced,* 638 F.2d 159, 163 n. 2 (10th Cir.1980); *Tampa*

*Sand,* 132 N.L.R.B. at 1565–66, is misplaced. In each of those cases, the Board focused on testimony that the union officials specifically told the neutral employees that each employee's decision whether or not to walk off the job was his or her own to make. It is precisely the absence of such evidence here—neutralizing, as it were, any inference of inducement—that renders the fact of the conversations so telling.

Moreover, the union agents who talked to the neutral unionized employees are particularly within the control of the union, a fact which in similar circumstances has led the Board to draw an adverse inference against the union for failing to produce evidence about the content of conversations involving union members. *See Ironworkers Dist. Council of the Pacific Northwest (Hoffman Constr. Co.),* 292 N.L.R.B. 562, 578, 1989 WL 223819 (1989); *Carpenters Local 316 (Thornhill Constr.),* 283 N.L.R.B. 81, 84, 1987 WL 89514 (1987); *Local 3, Int'l Brotherhood of Elec. Workers (Hunts Point Elec. Wiring Serv., Inc.),* 271 N.L.R.B. 1580, 1585 & n. 6, 1586, 1984 WL 36770 (1984); *see also International Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. NLRB,* 459 F.2d 1329, 1335–1342 (D.C.Cir.1972). The Board and the union's protest that the General Counsel had the burden of proof and is therefore to blame for failing to produce this evidence strikes us as flatly inconsistent with this principle. A reasonable factfinder must ask, as do we: What save for inducing or encouraging words could the union agents possibly have said to the recipients of the handbills? "Have a nice day"? "How 'bout them Cubs?"? Any "non-inducement" words would be inconsistent with the setting, and to suppose the union agents uttered them would be sheer speculation. By contrast, the inference that the union orally induced the employees to ccase work has, as we have shown, a substantial evidentiary base.

We come last to the actual work stoppage that occurred after the handbilling and conversations. Here again, the ALJ reasoned that, under Board precedent, a work stoppage alone is not *sufficient* proof of inducement. *See, e.g., Gould,* 238 N.L.R.B. at 622–23; *Teamsters, Local Union No. 688 (Levitz Furniture Co.),* 205 N.L.R.B. 1131, 1132–33, 1973 WL 5220 (1973); *Tampa Sand,* 132 N.L.R.B. at 1568; *cf. United Scenic Artists, Local 829 v. NLRB,* 762 F.2d 1027, 1033 (D.C.Cir. 1985) (union's intent, and not the effect of its actions, is the critical aspect of finding an unlawful secondary "object"). Chairman Gould made the same point in concluding, despite his misgivings, that the union did not violate the Act. However correct this proposition is, it certainly cannot be taken to mean, as the ALJ implied, that the fact of a work stoppage has no evidentiary value in proving a case of inducement. To the contrary, the Board has found that a union's handbilling constituted unlawful inducement in part because of its effect in producing a work stoppage, *see International Ass'n of Bridge, Sructural & Ornamental Ironworkers, Local No. 433 (R.F. Erection),* 233 N.L.R.B. 283, 287, 1977 WL 9285 (1977), *enforcement granted in part and denied in part,* 598 F.2d 1154 (9th Cir.1979); *see also Catalytic,* 829 F.2d at 435 ("The simple cause-and-effect of the appearance of the leafletters and work stoppages eloquently testified to the purpose of the enterprise."), and has also relied on the absence of a work stoppage as evidence that a union did not engage in unlawful inducement, *see, e.g., United Scenic Artists, Local 829 (Theatre Techniques, Inc.),* 243 N.L.R.B. 27, 28, 1979

WL 9395 (1979), *rev'd on other grounds,* 655 F.2d 1267 (D.C.Cir.1981); *Levitz Furniture,* 205 N.L.R.B. at 1133 (refusing to presume from "one isolated instance when a delivery was not made" that the union's handbilling was in effect a signal picket).[8] We think the Board's approach in these prior cases is consistent with our view of what a reasonable factfinder would have been obliged to do in this case: to consider a work stoppage as probative evidence of inducement, even if not sufficient evidence taken alone.

We suppose it is *possible* to infer that the neutral employees "spontaneously" walked off the job after receiving the handbills and talking with the union agents. The real question is whether it is a *reasonable* inference to draw.[9] We think not. As we observed, the ALJ employed a kind of "divide and conquer" evidentiary strategy, dissecting the General Counsel's case into evidentiary fragments that standing alone would be insufficient to prove inducement, but neglecting to consider what we think is the overpowering evidentiary force of those parts put together. For the Board to focus on evidentiary fragments and to ignore the aggregate weight of the evidence is no more permissible than ignoring evidence that contradicts its conclusion. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

\* \* \* \*

We have no difficulty, reviewing the whole record, in concluding the Board's finding is defective; it lacks substantial evidence.

---

8. The Board has even suggested (though admittedly in *dicta*) in distinguishing handbilling from picketing that handbilling is only "lawful" when unaccompanied by a work stoppage. *See Local 917, International Brotherhood of Teamsters (Industry City Assocs.),* 307 N.L.R.B. 1419, 1419 n. 3, 1992 WL 182378 (1992) (citing *Hospital & Serv. Employees Union, Local 399 (Delta Air Lines, Inc.),* 293 N.L.R.B. 602, 603, 1989 WL 223951 (1989)).

9. We, unlike the dissent, do not think it matters that the stipulated facts did not specify whether *all* or only some of the employees stopped work or the exact length of the conversations with the union agents. Nor, for that matter, did the ALJ.

# AUTOMOTION, INC. IS <u>DESTROYING</u> THE STANDARD OF WAGES FOR HARD-WORKING UNION MEMBERS

## AUTOMOTION, INC. PAYS SUBSTANDARD WAGES AND FRINGE BENEFITS.

## IGNORING THE AREA STANDARD THREATENS THE EFFORTS AND SACRIFICES OF ALL UNION MEMBERS.

Iron Workers Local 386 is currently engaged in a labor dispute concerning the failure of Automotion, Inc. to pay the area standard wages and fringe benefits. We are appealing only to the general public. We are not seeking any person to cease work or to stop making deliveries.

WALD, Circuit Judge, dissenting:

In my view, the majority goes too far afield from the record and established restraints on our appellate review powers in order to overturn the Board and find that the union committed a violation of section 8(b)(4). An opinion upholding the decision of the Board in this case, which I support, on the other hand would have had only a limited impact; at most, it would have sent a message to future companies that they ought not agree to be bound by too sparse factual records. Instead, the majority issues a surprisingly broad-based opinion which reverses the Board, finds a union in violation of federal labor law,[1] and sets forth new constitutional law restricting the reach and protection of the First Amendment.

The relevant facts of this case are easily summarized. Warshawsky & Company ("the Company") is engaged in the warehousing and sale of auto parts and accessories. In 1997, the Company decided to build a warehouse and mail order facility in LaSalle, Illinois. The Company hired a general contractor who, in turn, hired various subcontractors, each of which maintained collective bargaining agreements with various unions representing employees working on the construction site ("construction employees"). These employees worked at the construction site Monday through Friday, 7 a.m. to 3:30 p.m. and on occasional Saturdays as well.

In March 1997, the Company directly retained Automotion Inc. ("Automotion") to install certain rack and conveyor systems at the construction site. Shortly thereafter, Ironworkers Local 386 ("Union"), which had no labor dispute with either the general contractor or any of the subcontractors, engaged in area standards picketing against Automotion. The Union discontinued this picketing after being informed that Automotion was not yet working on the site. Subsequently, an agent of the Company sent the Union a letter stating that Automotion employees would be scheduled to work on the site Monday through Friday from 4 p.m. to 6 a.m. and all day Sunday. The letter requested that any future picketing of Automotion be conducted only when Automotion employees were on site.

On March 13, 1997, at around 6:40 a.m., various agents of the Union were stationed in close proximity to the entrance of the construction site. During about a four hour period, the Union agents distributed copies of a handbill to construction employees as they approached the construction site. A copy of the handbill appears as an appendix to the majority's opinion. Union agents distributed the same handbill at the same location and at approximately the same time on March 14, 17, 18, and 19. Employees of Automotion were not at the site on any of these occasions. Certain construction employees (number unknown, *see* below) refused to enter the construction site on each of the days on which the Union handbilled.

On March 13, 1997, the Company filed an unfair labor practice charge alleging illegal secondary activity on the part of the Union. On March 25, 1997, the Regional Director issued a complaint charging that the Union had violated section 8(b)(4)(i) and (ii)(B) of the National Labor Relations Act, which, in relevant part, makes it unlawful for a union to "induce or encourage" any individual employed by a neutral employer (*i.e.*, one with whom the union has no primary labor dispute) to engage in a work stoppage, where the union's object is to force the neutral to cease doing business with an employer with whom the union does have a primary dispute.

---

1. In so finding, the majority does not take seriously enough the proposition that unions, as well as individuals, are innocent until proven guilty, and that courts must therefore be cautious in concluding that a union has violated federal labor law. *See NLRB v. Iron-* *workers Local 433*, 850 F.2d 551, 555 (9th Cir.1988) ("What is at issue is a finding that [the union] violated federal law. This is a serious conclusion, one we do not lightly reach.").

Before the Administrative Law Judge ("ALJ"), the parties presented a joint motion accepting a stipulation of facts and agreeing to waive a hearing. The stipulation contained a copy of the handbill distributed by the Union. The stipulation also provided that "various" agents of the Union were stationed on a road used primarily by individuals going to and from the construction site. The stipulation provided that the Union agents gave copies of the handbill to individuals entering the site and that the agents "briefly spoke" with these individuals. Finally, the stipulation provided that "the individuals" on the first day, and then "various individuals" on subsequent days refused to enter the construction site and perform work for their respective employers. Based on the stipulation of facts, which constituted the entire record, and on the briefs, the ALJ dismissed the complaint against the Union, concluding that "a preponderance of the ... evidence fails to establish that the failure of some of [the construction] employees to report for work ... had been other than a spontaneous reaction by those employees to the [Union's] lawful actions of publicizing, other than through picketing or through conduct tantamount to picketing, undisputed facts about Autom[o]tion's wages and benefits." *Iron Workers Local 386 (WARSHAWSKY & CO.)*, 325 N.L.R.B. No. 141, at 4–5, 1998 WL 251581 (May 14, 1998). The Board subsequently adopted the opinion of the ALJ, with Chairman Gould writing a concurring opinion. The majority opinion today reverses the Board and insists that it lacked "substantial evidence" for its conclusion that a violation of section 8(b)(4) had not been proven. I dissent from that holding on two basic grounds.

First, in order to reach its result, the majority creates new constitutional law restricting the scope and protection of the First Amendment. In taking the ALJ to task for considering the First Amendment in his analysis of whether the Union violated section 8(b)(4), the majority opines that "the First Amendment does not protect communications directed at—and only at— ... neutral employees...." Majority opinion ("Maj. op.") at 952. This novel proposition, I believe, is simply wrong.

In his opinion, the ALJ correctly noted that in order to establish a violation of section 8(b)(4)(i)(B) and (ii)(B), the General Counsel had to prove by a preponderance of the evidence both that the Union induced or encouraged individuals employed by the Company to engage in a work stoppage and that the Union had the object thereby of forcing the Company to cease dealing with Automotion. The ALJ was guided in his attempt to discern the intent and motive of the Union by the Supreme Court's decision in *Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. and Constr. Trades Council*, 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988) (*DeBartolo II*).

*DeBartolo II* is a case where the Supreme Court, under the canon of constitutional avoidance, construed section 8(b)(4) as not prohibiting the distribution of handbills to consumers "press[ing] the benefits of unionism to the community and the dangers of inadequate wages to the economy and the standard of living of the populace."[2] *Id.* at 576, 108 S.Ct. 1392. In so holding, the Supreme Court emphasized the difference, constitutionally speaking, between pickets and handbills, the former constituting a mixture of conduct and communication and the latter constituting pure expressive speech:

> [P]icketing is a "mixture of conduct and communication" and the conduct element "often provides the most persuasive deterrent to third persons about to enter a business establishment." Handbills containing the same message ... are "much less effective than labor pick-

---

**2.** The handbills in *DeBartolo II* were distributed to patrons of a mall in order to protest the alleged substandard wages paid by a company hired by the mall owner to construct a department store there.

eting" because they "depend entirely on the persuasive force of the idea."

*Id.* at 580, 108 S.Ct. 1392 (quoting *NLRB v. Retail Store Employees (Safeco)*, 447 U.S. 607, 619, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980) (Stevens, J., concurring)). In reaching its decision in *DeBartolo II*, the Court defined the so-called "publicity proviso" to section 8(b)(4) as constituting a clarification of section 8(b)(4). The publicity proviso provides, *inter alia*, that section 8(b)(4) did not prohibit "publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer." 29 U.S.C. § 158(b)(4) (1994). The handbills in *DeBartolo II* did not fall specifically under the publicity proviso; however, the Supreme Court, in interpreting the proviso as a clarification of, rather than an exception to, section 8(b)(4), found that other forms of handbilling (*i.e.*, in addition to those that fall within the terms of the proviso) would not necessarily be prohibited under section 8(b)(4).

Like the handbills in *DeBartolo II*, the handbills in the instant case were not covered by the publicity proviso.[3] And while the handbills in *DeBartolo II* were distributed to consumers at a shopping mall, the ALJ nevertheless found the reasoning of *DeBartolo II* to be "important to the resolution of the instant case":

3. The handbilling in this case did not fall under the publicity proviso because, on its face, the proviso deals only with handbilling that does not result in a work stoppage. Additionally, the ALJ found that the handbilling here did not fall under the publicity proviso because the handbills did not advise the public that the Company was distributing Automotion's products. The full text of the proviso is, as follows:

[Nothing in section 8(b)(4)] shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and mem-

[T]he fact that the [Supreme Court found the publicity] proviso [to be] an express "clarification," rather than an exception, is some indication that Congress contemplated other, unstated, clarifications which would inform resolution of issues arising under Section 8(b)(4) of the Act's stated prohibitions. Second, such unstated clarifications arise in the context of the publicity proviso's ... definition of "the public" which embraces both "consumers and members of a labor organization[.]" Inasmuch as the proviso serves as a clarification, rather than an exception, the reach of the prohibition which it interprets, explains, and clarifies must, of necessity, take into account publicity of disputes *which is directed to members of labor organizations, without too readily concluding that such publicity constitutes unlawful inducement or encouragement.*

*WARSHAWSKY & CO.*, 325 N.L.R.B. No. 141, at 6 (emphasis added).

Of course, as the ALJ acknowledged, handbilling does not enjoy unfettered exemption under section 8(b)(4), in that "[e]specially in the context of common situs situations, labor organizations must make reasonable efforts to minimize the impact of their messages on neutral employers and their employees." *Id.* at 7. However, he continued, this does not mean that "those labor organizations [in the context of a common situs] are ... required to abandon altogether communication of their messages." *Id.* Citing again to *DeBartolo II*, the ALJ noted the following:

bers of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution. 29 U.S.C. § 158(b)(4) (1994).

[T]he Supreme Court recognized the constitutional and statutory protection extended to handbill messages protesting failures to satisfy area wage and fringe benefit standards—those which "press[ ] the benefits of unionism to the community and the dangers of inadequate wages to the economy and the standard of living of the populace." [*DeBartolo II,*] 485 U.S. at 576, 108 S.Ct. 1392. Therefore, when evaluating the lawfulness of [handbill] messages, even when disseminated to members of a labor organization at a common situs, analysis must proceed with care.

*Id.* The ALJ's point was that the Supreme Court has recognized the constitutional and statutory protection of handbills, like those in the instant case, which press the benefits of unionism and the dangers of inadequate wages to the community. The Supreme Court also defined the publicity proviso as a clarification, an explanation, of section 8(b)(4). The publicity proviso in turn defines the public as including members of labor organizations. Accordingly, the analysis of whether a union has violated section 8(b)(4) as a result of communicating via handbills with members of other labor organizations must proceed with some care. In other words, one ought not too easily assume that a union has an illegal intent or motive when handbilling neutral employees; a union has a First Amendment right, even if not an unfettered right, to express its ideas to all members of the public.

Surprisingly, the majority seems to be saying that the First Amendment is not implicated at all when a union communicates solely with neutral employees. There is no support for this belief. The majority jumps from the Supreme Court's holding that the prohibition under section 8(b)(4) of the inducement or encouragement of a secondary work stoppage does not constitute an unconstitutional abridgement of free speech, *see International Bhd. of Elec. Workers v. NLRB*, 341 U.S. 694, 705, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), to its conclusion that any kind of union speech directed to neutral employees carries no First Amendment protection. This, in my view, puts the cart before the horse. It is of course true that if the General Counsel had actually proven that a union induced and encouraged employees of a neutral employer to engage in a work stoppage with the object of forcing a neutral employer to cease dealing with the primary, then that union could not complain that its First Amendment rights had been violated. But it does not follow from this proposition that no communication to neutral employees is protected speech or, as the majority implies, that the ALJ erred in interpreting "induce" or "encourage" narrowly in order to avoid First Amendment concerns. *See* Maj. op. at 951 ("[The ALJ] presumably thought that . . . the constitutional avoidance canon suggests that the words 'induce or encourage' in § 8(b)(4) should be interpreted, and applied, narrowly so as not to proscribe the handbilling involved in this case. We think the First Amendment is not at all implicated . . . .").

The majority places great reliance, in this regard, on its ability to distinguish the facts of *DeBartolo II* from those here. Again, without any affirmative support that I can find, the majority thinks it adequate to point out that *DeBartolo II* involved handbills directed to consumers as opposed to the handbills here, directed to neutral employees. It reasons that when a union handbills consumers and they subsequently refuse to patronize a neutral employer, these consumers are following a wholly legal course of action, namely, withholding their buying power. In contrast, it argues, when a union handbills neutral employees, the only course of action open to these employees is illegal to them under section 8(b)(4); that is, neutral employees, when informed through a handbill that a primary employer pays substandard wages, can only respond sympathetically by engaging in an illegal work

stoppage.[4] This single-option assumption is, however, mistaken. Members of labor organizations—even employees of neutrals—are people too. They also consume. They also may be potential future joint venturers with or employees of the offending company. They certainly are members of their communities with an interest in knowing which employers in the area pay substandard wages. The majority assumes that any time a union expresses its ideas to neutral employees, that union has an illegal intent under section 8(b)(4) and the neutral employees can only "contribute to the cause" by engaging in an illegal work stoppage under section 8(b)(4), an assumption without support in this record or in ordinary experience and without which, the distinction the majority attempts to draw between *DeBartolo II* and the instant case simply dissolves. In my view, the ALJ was completely justified in construing section 8(b)(4) narrowly and in assessing the situation with appropriate concern for the First Amendment rights of union members.

My second ground for dissenting is that I believe the majority errs in concluding that the stipulated record reasonably compels the conclusion that the Union had an illegal intent and motive under section 8(b)(4). It is settled law that the burden of proof is on the General Counsel to prove each and every element of a section 8(b)(4) violation, *see Local Union No. 501, Int'l Bhd. of Elec. Workers v. NLRB*, 756 F.2d 888, 898 n. 8 (D.C.Cir.1985) ("The general counsel and the charging party bear the

burden of proving a secondary boycott violation ..."), and that courts owe substantial deference to the findings of the Board, *see Laro Maintenance Corp. v. NLRB*, 56 F.3d 224, 228 (D.C.Cir.1995) ("The court's review of the Board's factual conclusions is highly deferential ...").[5] The majority nevertheless reverses the Board for failing to draw all inferences from purely circumstantial evidence in favor of the party with the burden of proof. This result is quite unprecedented; it is akin to reversing a jury verdict in a civil case because the jury, based on purely circumstantial evidence, declined to find in favor of the plaintiff. In reality, this case is quite simple: the Company (and the General Counsel) made a fatal strategic error in waiving a hearing before the ALJ and in agreeing to be bound by a stipulated record that did not sufficiently support (let alone compel) the conclusion that the Union violated section 8(b)(4).

To begin with, the majority unfairly wrests more (negative) substance from the stipulation of facts than is actually there. In truth, the stipulation is quite spare. The stipulation contains a copy of the handbill given to the construction employees. The handbill mentions nothing about the neutral employer (*i.e.*, does not say that the Company had engaged in any wrongdoing by hiring Automotion) and, instead, contains a specific proviso stating that the Union was engaged in a labor dispute with Automotion (again, not the neutral employer) and that the Union was

4. Indeed, the majority says, being "informed [of the message on the handbill] there is only one possible action [neutral employees] can take that will contribute to the cause." Maj. op. at 954.

5. The deference owed to the Board's findings is even greater where, as here, the critical question involves the intent and motive of the Union. As we have repeatedly warned:
   The court's review of the Board's determination with respect to motive is even more deferential [than the court's review of Board findings more generally]. Motive is a question of fact that may be inferred from

direct or circumstantial evidence. In most cases only circumstantial evidence of motive is likely to be available. Drawing such inferences from the evidence to assess an employer's [or union's] ... motive invokes the expertise of the Board, and consequently, the court gives "substantial deference to inferences the Board has drawn from the facts," including inferences of impermissible motive.
*Laro Maintenance Corp.*, 56 F.3d at 229 (quoting *Gold Coast Restaurant Corp. v. NLRB*, 995 F.2d 257, 263 (D.C.Cir.1993)) (citations omitted).

"not seeking any person to cease work or to stop making deliveries." Second, the stipulation states that "various" agents of the Union "were stationed at certain locations along Murphy Road ... a road used primarily by individuals going to and from the LaSalle facility construction project." From this stipulation, we know only that Union agents (number unknown) were stationed along a road used primarily (but not exclusively) by individuals entering the construction project. The stipulation also states that the agents gave copies of the handbill to the individuals entering the construction project and "briefly spoke with" these individuals. From this, we know only that the agents spoke with the employees, but we have no evidence whatsoever of the content of the conversations, nor do we know how long these conversations were; "briefly" could mean five seconds, merely enough time to say, "We are members of the Iron Workers Local 386, please read this handbill," or five minutes, enough time to request that the employees not engage in a work stoppage, to request that the employees engage in a work stoppage, or, indeed, to talk about the Cubs. Finally, the stipulation states only that "the individuals" (on the first day) and then "various individuals" (on the subsequent days) refused to enter the construction project and perform work for their respective employers. We know from this only that more than one employee refused

to work, but we do not know whether the number amounted to 10 out of 50; 50 out of 100; or 200 out of 200. The exact number and ratio of employees who refused to work would certainly shed a great deal of light on what one ought infer from the other facts of the case, but, alas, we have no access to that information on this record.

The majority speaks about the need to draw "reasonable" inferences, *see* Maj. op. at 953–54, but then proceeds to draw every possible inference against the Union. For example, with respect to the handbill itself, the majority finds that the legal disclaimer on the handbill is of no evidentiary moment because "that caveat is contained in only very small print at the bottom of the handbill." Maj. op. at 954. In contrast, the ALJ found the disclaimer to constitute some "evidence that '[the Union] effectively took steps to neutralize [any] implied inducement or encouragement of employees' of other employers." *WARSHAW-SKY & CO.*, 325 N.L.R.B. No. 141, at 9 (quoting *Service & Maintenance Employees Union No. 399 (The William J. Burns Int'l Detective Agency)*, 136 N.L.R.B. 431, 437, 1962 WL 16286 (1962)). The ALJ's inference with respect to the disclaimer is, at the very least, reasonable. The disclaimer is perfectly readable and although all boilerplate language is somewhat legalistic, that does not mean that it is without any effect.[6]

---

6. The cases which the majority cites for discounting the existence of the disclaimer are clearly distinguishable. In *National Ass'n of Broad. Employees, Local 31*, 237 N.L.R.B. 1370, 1978 WL 7966 (1978), the Board simply found that the existence of a legal disclaimer on a handbill did not override the otherwise clear indication that the handbilling involved there was an integral part and extension of picketing being conducted simultaneously by the same union. *Catalytic, Inc. v. Monmouth & Ocean County Building Trades Council*, 829 F.2d 430 (3d Cir.1987), is not even a Board case; it is a review of a district court injunction against a labor union. Moreover, counsel for the union in that case admitted at oral argument that the union handbilling constituted a "signal." Finally, the court of appeals' finding that the disclaimer on the flyer

constituted a "signal" was preceded immediately by the statement that the union's argument against the findings of the district court "ignore[d] the wide latitude open to triers of fact to make factual determinations on the basis of rational inferences which arise from the nature, location, and effect of picketing." *Id.* at 436 (quoting *American Radio Ass'n, AFL–CIO v. Mobile Steamship Ass'n, Inc.*, 419 U.S. 215, 232, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974)). Of course, the trier of fact in the instant case made the opposite factual determination, that the disclaimer constituted credible evidence against an illegal intent under section 8(b)(4). Finally, in *International Bhd. of Elec. Workers, Local 453 (Southern Sun Elec. Corp.)*, 252 N.L.R.B. 719, 1980 WL 12469 (1980), the Board simply noted that a self-serving disclaimer that picketing was for

The majority also infers that because the Union handbilled only neutral employees, it must have had an illegal intent thereby. But the ALJ's inference from this same fact is equally compelling, or, again, at least reasonable. The Company chose to segregate Automotion employees from the construction employees; by scheduling Automotion employees at odd hours, the Company made it impossible for the Union to communicate its message to both Automotion and construction employees at the same time. The ALJ found that because the Automotion employees were presumably already aware that their wages were below area standards, nothing was to be gained by the Union in reinforcing this knowledge. On the other hand, the construction employees were less likely to have been aware that Automotion's wages were below area standards. The ALJ determined that the Union had a legitimate (non-illegal) interest in informing the construction employees of Automotion's substandard wages and that it was not required to republish this fact to Automotion employees simply to avoid the appearance of an improper motive under section 8(b)(4).

The majority's final inference of intent to induce is drawn from the fact that a conversation between Union agents and employees took place and that some kind of a work stoppage ensued. But what the majority infers from that sequence paints too bleak a picture for the Union. The

majority conveniently ducks the question of how many of the neutral employees, in response to the handbill and the words spoken by Union agents, turned around and went home on the days that the Union handbilled. See Maj. op. at 959–50. If in fact we knew that all, virtually all, or even a substantial number of the employees spoken to refused to work each day, then, perhaps, the majority's inference that the work stoppage was due to the Union's words might be justified. However, we do not know from the record how many employees in fact turned around and went home. More specifically, we do not even know the ratio of employees who went home to employees who stayed and went to work. The stipulation tells us nothing and the ALJ only found that a preponderance of the evidence failed to "establish that the failure of *some* of those employees to report for work . . . had been other than a spontaneous reaction by those employees to the [Union's] lawful actions. . . ." *WARSHAWSKY & CO.*, 325 N.L.R.B. No. 141, at 4–5 (emphasis added). The majority has to assume something totally absent from the record, namely, that all, virtually all, or at least a substantial number of the employees, refused to work, in order to infer from that that "any 'non-inducement' words would be inconsistent with the setting, and to suppose the union agents uttered them would be sheer speculation."[7] Maj. op. at 955. Absent this first assump-

a recognitional purpose was not determinative of the union's object in picketing. This unremarkable proposition does not mean that legal disclaimers have no evidentiary weight at all, it simply means that the mere existence of such a disclaimer does not necessarily win the day for the union.

7. The majority cites again to *Catalytic* for the proposition that the "simple cause-and-effect of the appearance of leafletters and work stoppages eloquently testified to the purpose of the enterprise." 829 F.2d at 435. Again, *Catalytic* is not a Board case. It is a case where the court affirmed the findings of the district court, after trial, that a union had violated section 8(b)(4) and that an injunction was proper. The court in *Catalytic* rejected

the union's arguments against the findings of the district court because they "ignore[d] the wide latitude open to triers of fact to make factual determinations on the basis of rational inferences which arise from the nature, location, and effect of picketing." *Id.* at 436 (quoting *American Radio Ass'n, AFL-CIO v. Mobile Steamship Ass'n, Inc.*, 419 U.S. 215, 232, 95 S.Ct. 409, 42 L.Ed.2d 399 (1974)). In any event, it is decidedly not the law that the effect of a work stoppage requires the conclusion of a section 8(b)(4) violation. To be sure, a work stoppage may constitute evidence of inducement, and the ALJ never said otherwise, but a work stoppage alone is not sufficient proof thereof. *See Teamsters, Local Union No. 688 (Levitz Furniture Co.)*, 205 N.L.R.B. 1131, 1973 WL 5220 (1973).

tion that the conversations and handbills affected more employees than not, to guess at the contents of these brief carside conversations is sheer speculation. It is not unfathomable, for example, that the Union agents merely reconveyed orally the gist of the handbill they were distributing. Clearly, had a hearing been held, testimony as to the content of the conversations could have been elicited. Without such testimony, it is the General Counsel's burden to prove the Union's speech fell on the inducement side, not the Union's burden to prove it did not.[8]

In the end, the majority's decision requires an acceptance of the proposition that the evidence here, entirely circumstantial, is so overwhelming against the Union that it brooks of only one conclusion, a conclusion that is at odds with the judgment of both the ALJ and the unanimous Board and one which must be reached in the face of accepted legal principles that the General Counsel bears the burden of proof and that courts owe substantial deference to the Board's findings. Ultimately, Chairman Gould's concurrence said it right:

> [T]he Respondent's conduct here, although arguably consistent with an attempt to induce a work stoppage, ultimately lacks a sufficient basis to support such a finding [of a section 8(b)(4) violation]. The "nod, wink, and a smile" theory cannot prevail in these circumstances where the handbill explicitly stated that the Respondent was not seeking a work stoppage, and where the

record fails to show what the Respondent said to the employees as they approached the jobsite and received the handbills. In the final analysis, a finding of a violation must be based on something more than the mere fact that the employees ceased work in response to the Respondent's conduct.

*WARSHAWSKY & CO.*, 325 N.L.R.B. No. 141, at 2.

I respectfully dissent.

---

8. The majority attempts to shift this burden to the Union by citing a string of cases, *see* Maj. op. at 954, which stand for the proposition that when a party who has relevant information in her control fails to produce that evidence, that failure may give rise to an inference that the evidence is unfavorable to her, *see, e.g., International Union, United Automobile, Aerospace & Agric. Implement Workers of Am. v. NLRB*, 459 F.2d 1329, 1335–42 (D.C.Cir.1972). It is true that had a hearing been held, and the Union had refused to call

its agents to testify (or its agents refused to testify) as to the contents of the conversations, then the ALJ might have been justified in drawing an inference that the missing testimony would have been damaging to the Union. Here, however, there was no hearing and no such phantom testimony. The Union did not fail to provide evidence in its control; it merely agreed, *jointly with the Company*, to a stipulation of facts. There is absolutely no justification for drawing an inference against the Union merely because it agreed to a *joint* stipulation of facts.